*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COMMITTEE FOR MARSHALL-NOT THE
MEGASITE,

        Plaintiff-Appellant/Cross-Appellee,

and

REGIS KLINGLER, STEPHANIE KLINGLER,
HOLLY HARNDEN, MARK ROBINSON,
GRETCHEN ESSER, JAMES SLEIGHT, JR., and
DIANE KOWALSKE,

        Plaintiffs,

v

CITY OF MARSHALL and MICHELLE EUBANK
in her capacity as the MARSHALL CITY CLERK,

        Defendants-Appellees,

and

MARSHALL AREA ECONOMIC
DEVELOPMENT ALLIANCE,

        Intervening Defendant-Appellee,

and

MICHIGAN ECONOMIC DEVELOPMENT CORP.
and MICHIGAN STRATEGIC FUND,

        Cross-Appellants.

FOR PUBLICATION
June 18, 2024
2:45 p.m.

No. 369603
Calhoun Circuit Court
LC No. 2023-001712-CZ

-1-

Before: CAMERON, P.J., and N. P. HOOD and YOUNG, JJ.

PER CURIAM

In its simplest form, this case is about (1) when a party is entitled to mandamus and (2) interpretation of the city of Marshall's charter. This case started with efforts by defendant-appellee, the city of Marshall (the City), to rezone a parcel of real estate from Marshall Township zoning to the City's new industrial and manufacturing zoning designation, as part of a project to develop an electric battery manufacturing facility called the Ford BlueOval Battery Park (the so-called "Marshall Megasite"), and counterefforts by plaintiff-appellant/cross-appellee, Committee for Marshall-Not the Megasite (the Committee) to prevent the rezoning. The City eventually rezoned the property through an ordinance that also included appropriations. Plaintiffs Regis Klingler, Stephanie Klingler, Holly Harnden, Gretchen Esser, and Mark Robinson (the petitioners)[1] then formed the Committee and, with others, circulated a petition for a ballot referendum on the City's decision. The City Clerk, defendant Michelle Eubank, rejected the petition because it related to an ordinance that included appropriations (among other reasons). The Committee and the petitioners sued seeking a writ of mandamus compelling Eubank to put the referendum on the ballot as well as injunctive and declaratory relief, claiming that the ordinance violated the City's charter. Numerous other stakeholders, including the Marshall Area Economic Development Alliance (MAEDA), the Michigan Economic Development Corporation (MEDC), the Michigan Strategic Fund (MSF), and others, sought to intervene; only MAEDA succeeded.

The Committee now appeals the trial court order dismissing its claims. It argues that the trial court erred in several ways by rejecting its claims that the City violated the law when it rezoned the property. It also maintains that the trial court should have determined that Eubank exceeded her authority when she rejected the petition for a referendum.

On cross-appeal, MEDC and MSF challenge the trial court's order denying their motions to intervene. They also argue—in the form of issues on cross-appeal—that this Court should affirm the trial court's decision to dismiss the Committee's claims.

We affirm the trial court's decision to dismiss the Committee's claims. It correctly concluded that the Committee was not entitled to mandamus relief because of the existence of an alternative adequate remedy (namely, an appeal of the Marshall City Council's final decision on certification) and the lack of a clear, legal right. It also correctly concluded that the ordinance at issue complied with the Marshall City charter. We dismiss MEDC and MSF's cross-appeal for lack of jurisdiction. For these reasons and those stated below, we affirm.

## I. BACKGROUND

The subject of the City's rezoning efforts and the Committee's petition drive, and ultimately its lawsuit, was the development of the Ford BlueOval Battery Park. The City,

---

[1] The seven individual plaintiffs are not parties to this appeal. Only the Committee filed a claim of appeal.

MAEDA, MEDC, MSF, and others worked to facilitate the development. The Committee and petitioners worked to stop the development.

## A. THE MASTER 425 AGREEMENT

In February 2022, the City and Marshall Township (Township) entered a land transfer agreement (the Master 425 Agreement).[2] Previously, from 2006 until the 425 Agreement, the City and Township were parties to another agreement governing land transfers between the two jurisdictions for economic development. Under the new agreement, the City and Township contemplated that they would enter individual "425 Agreements" governing particular transfers consistent with the Master 425 Agreement, and provided rules for such agreements. The applicable rules depended on whether the individual agreement involved a commercial or industrial development, or involved a residential development; it also depended on the location of the development relative to certain interstates.

The Master 425 Agreement provided a process for property owners with property designated within the Master 425 Agreement and located within the Township to request services and conditionally transfer the property to the City for commercial or industrial purposes. Once a property owner requests services, a contract for the property's conditional transfer is presented to the Marshall City Council and the Township Board of Trustees for approval.

Under the Master 425 Agreement, and pursuant to the Joint Municipal Planning Act, 2003 PA 226, MCL 125.141 *et seq*., the City and Township also established a Joint Municipal Planning Commission (JPC). They agreed that the JPC would "control all land usages for lands subject to a 425 Agreement between the City and Township." The JPC had an equal number of members from both the City and the Township.

Schedule A to the Master 425 Agreement provided the rules for the JPC, including rules regarding the application of the City's zoning ordinances versus the Township's. Critically, the zoning definitions within the City's zoning ordinances applied to residential lands located south of I-94 and east of I-69. The parties also agreed that the City's zoning ordinances applied to all commercial and industrial lands subject to the JPC jurisdiction regardless of location. But "residential zoned lands lying west of I-69 or north of I-94 shall be administered by the JPC" per the Township's zoning and planning acts and Township procedures and definitions.

## B. REZONING THE MEGASITE

In February 2023, the Marshall Board of Trustees and the Marshall City Council approved conditional land transfers that brought certain properties located in the Township under the City's jurisdiction. This followed requests the City manager received from property owners to enter into individual 425 agreements to bring their properties located in the Township under the City's

---

[2] The parties refer to land transfers under this agreement as Act 425 transfers after the law that permits cities, townships, and villages to enter into agreements to transfer jurisdiction over land for a period of years for the purpose of facilitating economic development, which was first enacted by 1984 PA 425. See MCL 124.21 *et seq*.

jurisdiction in order to receive the City's services. The owners had either transferred their property to MAEDA or were under contract to do so. MAEDA eventually obtained approval to combine these properties into one parcel. It subsequently obtained approval to split off 741 acres for the proposed development. Those 741 acres formed a new parcel, identified as parcel no. 53-281-021-00 and commonly known as 13700 West Michigan Avenue. This was the proposed development site for the Ford BlueOval Battery Park.

In April 2023, both MAEDA and the City took steps to rezone the parcel in overlapping processes before both the JPC and the Marshall City Council. On April 4, 2023, MAEDA applied to the JPC to rezone the land at issue from Township zoning to the City's new Industrial and Manufacturing Complex (I-3) zoning designation, a special zoning classification that the City had adopted specifically for the parcel to be used as the Marshall Megasite. See MCL 125.3401. On April 25, 2023, the JPC held a meeting where it considered and denied MAEDA's request to rezone 13700 Michigan Avenue in a four-to-two vote.

Meanwhile, a parallel rezoning effort was proceeding before the Marshall City Council. On April 15, 2023, 11 days after MAEDA's application and 10 days before the JPC vote, Eubank, the City Clerk, published a Notice of Public Hearing, scheduled for May 1, 2023 at 7:00 p.m. before the Marshall City Council regarding MAEDA's rezoning application. The published notice was in the Ad-visor and Chronicle, a local weekly publication. On April 17, 2023, the Marshall City Council introduced Ordinance 2023-8, titled "AN ORDINANCE TO AMEND THE ZONING MAP OF THE CITY OF MARSHALL SO AS TO CHANGE THE ZONING OF A PARCEL OF REAL PROPERTY, PARCEL #53-281-021-00, FROM TOWNSHIP ZONING TO INDUSTRIAL AND MANUFACTURING COMPLEX (I-3)." On May 1, 2023, the City held a public hearing on MAEDA's rezoning application, where it adopted Ordinance 2023-08. The ordinance rezoned 13700 Michigan Avenue from Township zoning to Industrial and Manufacturing Complex (I-3). It also included an appropriation of $40,000 for site plan review services and $250,000 for building inspection services for the proposed development of the land at issue.

### C. THE COMMITTEE AND ITS FAILED REFERENDUM EFFORTS

Days after the City rezoned 13700 Michigan Avenue, five of the petitioners, all City electors,[3] filed an affidavit to form a ballot question committee—the Committee—to initiate a referendum to challenge Ordinance 2023-08. On the affidavit, the petitioners agreed that they would "be responsible for circulating the referendum petition and for filing it in proper form." Those five petitioners, along with others,[4] collected and submitted 810 signatures for the ballot referendum petitions. The Committee filed its petition signatures with the City Clerk on May 30, 2023.

---

[3] The five petitioners were Regis Klingler, Stephanie Klingler, Holly Harnden, Gretchen Esser, and Mark Robinson.

[4] This included plaintiff James Sleight, Jr., who was a City elector but not a Committee member, plaintiff Diane Kowalske, who was a Marshall Township resident, and other circulators.

Eubank served a Certification of Insufficiency on the Committee on June 16, 2023. She stated that the petition was insufficient for two reasons. First, according to Eubank's certification, the petition was invalid because Ordinance 2023-08 was not subject to referendum. Eubank explained that under Marshall's charter, an ordinance that contained an appropriation was not subject to referenda. Second, she rejected the petition because the Committee included signatures that were not collected by the petitioners themselves. She reasoned that, because the petitioners agreed on the affidavit that they would be responsible for circulating the petition for signatures, only signatures actually collected by one of the individual petitioners would count toward the total number of signatures required to subject the ordinance to a referendum. She wrote that, when the signatures collected by persons other than the petitioners were excluded, the amount was not sufficient to meet the threshold for a referendum.

On June 20, 2023, the Committee hand-delivered a letter to the Marshall City Council seeking to review the legality of the Certificate of Insufficiency at its next regularly scheduled meeting.[5] The Marshall City Council upheld Eubank's decision at a meeting held later that same day.

## D. TRIAL COURT PROCEEDINGS

On July 27, 2023, the Committee and the petitioners filed a complaint for a writ of mandamus, seeking to compel Eubank and the City to certify the petition for a referendum on Ordinance 2023-08. The complaint requested three forms of relief: (1) mandamus, (2) injunctive relief, and (3) declaratory relief. Regarding mandamus, plaintiffs alleged that Eubank exceeded her authority by determining that the ordinance was not subject to referendum and invalidating the signatures on the ground that the person who collected the signatures was not one of the petitioners. The complaint alleged that Eubanks's certification was a ministerial task, entitling them to a writ of mandamus. Regarding injunctive relief, plaintiffs alleged that their petition was valid and that submission of the petition automatically suspended Ordinance 2023-08. They asked the trial court to order such suspension until after a referendum on the ordinance. Finally, plaintiffs requested declaratory relief. Specifically, they asked the trial court to declare that the Marshall City Council violated the City's charter by including an appropriation in a zoning ordinance. They alleged that the ordinance violated the requirement that all ordinances have a single issue given that the ordinance included two issues: a zoning change and appropriations.

Shortly after plaintiffs filed their complaint, multiple third-parties sought to intervene. The only successful intervenor-movant was MAEDA, which moved to intervene as the owner of the subject property. But others, including Ford Motor Company, the proposed developer, and a group favoring the development called Marshall Citizens for Jobs and Opportunity, unsuccessfully

---

[5] Under the Marshall City Charter, the City Clerk has 20 days to determine the sufficiency of a referendum petition. If she determines it to be sufficient, the City Council must either repeal the referred ordinance or place the referendum petition on the ballot. Marshall Charter, § 5.04(a). If she determines it to be insufficient, she must mail a certified copy of the certificate of insufficiency to the ballot committee. The ballot committee may then either amend the referendum petition or file a request with the City Council for a review of sufficiency. See Marshall Charter, § 5.04(b). That decision is subject to review by a court of competent jurisdiction. Marshall Charter, § 5.04(c).

moved to intervene. The MEDC and MSF filed a joint motion to intervene as investors and facilitators of the development project. Relevant to this appeal, the trial court denied MEDC and MSF's motion to intervene, allowing them to proceed as amici only. The trial court granted MAEDA's intervention, concluding was in a significantly different position than the other proposed intervenors because it owned the property whose zoning was at issue. It further determined that the City might not adequately protect its interests. It denied MEDC and MSF's motion, concluding that their interests were perfectly aligned with and represented by the City and MAEDA's positions. The trial court's order denying intervention was entered on August 7, 2023. MEDC and MSF did not apply for leave to appeal this order.

The City, Eubanks, and MAEDA quickly moved for summary disposition under MCR 2.116(C)(8). Plaintiffs filed a consolidated response in opposition. After a hearing on the motion, the Committee and petitioners filed an amended complaint for a writ of mandamus. Plaintiffs raised their original three claims: mandamus (Count I), injunctive relief (Count II), and declaratory relief (Count III). They also raised two new claims that mirrored arguments raised in (and which the court struck from) their response to the motion for summary disposition. First, plaintiffs added a claim in which they asked the trial court to declare that amending the zoning ordinances violated the Master 425 Agreement (Count IV). They also alleged a claim that Ordinance 2023-08 had not been properly noticed before it was adopted by the city council (Count V). The City, Eubank, and MAEDA moved to strike the amended complaint, maintaining that the Committee and petitioners failed to seek leave before filing the amended complaint and lacked standing to bring the new claims. The trial court entered an order holding the motion to strike in abeyance pending the issuance of its opinion and order in the original motion for summary disposition.

In September 2023, the trial court issued its opinion on the motion for summary disposition. Regarding mandamus, the trial court found that the Committee and the petitioners had an alternate avenue for relief: appealing the Marshall City Council's decision to affirm Eubank's refusal to certify to a court of competent jurisdiction. Specifically, the trial court found that Section 5.04 of the Marshall City Charter provides this alternative remedy. They did not avail themselves of that remedy. For that reason alone, the court wrote, the complaint for a writ of mandamus failed as a matter of law. The trial court further concluded that it should dismiss the mandamus action because the Committee and petitioners could not establish that Eubank violated a clear legal duty. It explained that Ordinance 2023-08 included an appropriation and was not subject to referendum. Eubank, therefore, had a clear legal duty to reject the petition. The trial court also rejected the collateral attacks on the validity of Ordinance 2023-08. It reasoned that the City's charter allows appropriations by ordinance. The trial court similarly determined that Ordinance 2023-08 did not violate the title and subject restrictions stated in the City's charter. Relying on these findings and conclusions, the trial court agreed that the City, Eubank, and the Marshall Development Alliance were entitled to dismissal of the complaint under MCR 2.116(C)(8). It, however, indicated that they should be given opportunity to amend.

After withdrawing their motion to strike the amended complaint, the City and Eubank moved for summary disposition of the amended complaint. The Committee and the petitioners responded in opposition. Each side largely reiterated arguments raised with respect to the earlier motion for summary disposition or motions to strike.

Following a hearing, the trial court granted summary disposition in favor of the City, Eubank, and MAEDA in January 2024. It dismissed Counts I through III for the same reasons that it stated in its first summary disposition opinion. Regarding Count IV (declaratory relief related to purported violations of the Master 425 Agreement), the trial court determined that neither the Committee, nor petitioners, had standing to challenge whether the City's zoning decision breached the Master 425 Agreement. In a footnote, it alternatively concluded that even if they had standing, their argument lacked merit. Regarding Count V (declaratory relief related to purported improper notice of Ordinance 2023-08), the trial court concluded that the Committee and petitioners did not have standing, but it also concluded that the claim, as alleged, failed as a matter of law. It explained that the City gave notice of the proposed ordinance on April 15, 2023, and set the date of the city council's meeting for May 1, 2023. The City did not, however, introduce the ordinance until April 17, 2023. Nevertheless, the City gave notice more than five days before the city council's meeting, which met the literal requirements of the City's charter. The court also stated that, as alleged, the City substantially complied with the notice requirement. The trial court entered its order dismissing the amended petition on the grounds set forth in the opinion.

This appeal followed. The Committee appealed by right the trial court's order dismissing its claims. The seven individual petitioner-plaintiffs did not file a claim of appeal and are not parties to this appeal. MEDC and MSF cross-appealed on February 26, 2024, challenging the trial court's order denying their motions to intervene.

## II. STANDARD OF REVIEW

We review de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(8). See *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). We likewise review de novo whether the trial court properly interpreted and applied applicable statutes and court rules, *Franks v Franks*, 330 Mich App 69, 86; 944 NW2d 388 (2019), and whether a party has standing to bring a claim, *MCNA Ins Co v Dep't of Technology, Mgt & Budget*, 326 Mich App 740, 743; 929 NW2d 817 (2019). We also review de novo the proper interpretation and application of the City's ordinances, *Gmoser's Septic Serv, LLC v East Bay Charter Twp*, 299 Mich App 504, 509; 831 NW2d 881 (2013), and charter, *Barrow v Detroit Election Comm*, 301 Mich App 404, 411; 836 NW2d 498 (2013).[6]

---

[6] At the threshold, the Committee argues that the trial court erred by granting defendants' first motions for summary disposition because plaintiffs filed a new complaint, which superseded the complaint that was the subject of the motions. This argument fails for at least two reasons. First, the Committee waived this issue by not raising it before the trial court. See *Tolas Oil & Gas Exploration Co*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 3 (holding that the failure to raise an issue in the trial court waives that issue for appellate review). See also *Samuel D Begola Servs, Inc v Wild Bros*, 210 Mich App 636, 642; 534 NW2d 217 (1995) (a party asserting error must show that it brought to the trial court's attention the same basis for the error later claimed on appeal). Second, the issue is moot. The trial court addressed the merits of the first motions, but it also granted the Committee leave to amend its complaint and gave the parties an opportunity to address the amended complaint in new motions for summary

### III. MANDAMUS

The trial court did not abuse its discretion when it dismissed the Committee's claim for a writ of mandamus. The trial court correctly concluded that the Committee's mandamus claim failed for at least two reasons: first, an adequate alternative remedy existed (judicial review as provided in Section 5.04 of the Marshall Charter), and second, the Committee did not have a legal right to a ballot referendum on an ordinance containing appropriations.[7]

While we review de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(8), see *Maiden*, 461 Mich at 118, we review for an abuse of discretion the trial court's decision whether to issue a writ of mandamus, *CB v Livingston County Comm Mental Health*, ___ Mich App ___, ___; ___ NW3d ___ (Docket No. 363697); slip op at 5. "A court abuses its discretion when its decision is outside of the range of reasonable and principled outcomes." *Id.*, quoting *Citizens for Higgins Lake Legal Levels v Roscommon Co Bd of Comm'rs*, 341 Mich App 161, 177-178; 988 NW2d 841 (2022). "A trial court necessarily abuses its discretion when it makes an error of law." *CB*, slip op at 5 (quotation marks and citation omitted).

### A. STANDING

At the threshold, we reject MAEDA's argument that the Committee lacks standing. MAEDA frames its standing argument as whether the Committee had standing to challenge the validity of Ordinance 2023-08. MAEDA, however, relies primarily on authorities related to appeals to zoning boards and circuit courts rather than standing to challenge a zoning decision in

---

disposition. When it granted the new motions for summary disposition, the trial court had to provide the Committee the opportunity to amend, notwithstanding that it had already granted leave to amend once before, unless the court determined that "amendment would not be justified." See MCR 2.116(I)(5); see also *Yudashkin v Linzmeyer*, 247 Mich App 642, 652; 637 NW2d 257 (2001) (stating that when a "plaintiff's amended complaint arises from the same conduct, transaction, or occurrence as that of the original complaint, the fact that summary disposition was granted in favor of these defendants does not preclude amendment"). The trial court's decision to consider the merits of the first motions, therefore, did not bar the Committee from seeking leave to amend its complaint again to correct the defects that led to dismissal under MCR 2.116(C)(8). The Committee merely *chose* not to amend. We conclude that whether the trial court should have treated the amended complaint as by leave and whether it should have declined to address the first motions for summary disposition are moot questions. See *League of Women Voters of Mich*, 506 Mich at 580-584.

[7] Because we affirm on the basis that the trial court correctly declined to issue a writ of mandamus because there was an alternative remedy (judicial review of the Council's decision under the Marshall Charter) and no legal right to have a referendum on an ordinance that included appropriations, we need not address the thornier issue of whether Eubank's certification of the petitions was a ministerial task. See, e.g., *Plunkett v Dep't of Transp*, 286 Mich App 168, 190; 779 NW2d 263 (2009) (declining to address remaining issues after finding the resolution of others to be dispositive).

the first place.  See *Sakorafos v Lyon Charter Twp*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 362192); slip op at 5-6.

Standing refers to a party's right initially to invoke a trial court's power to adjudicate a claimed injury in fact.  *Saugatuck Dunes Coastal Alliance v Saugatuck Twp*, 509 Mich 561, 592; 983 NW2d 798 (2022).  Our Supreme Court has stated that Michigan's standing doctrine is a prudential doctrine that recognizes that a litigant has standing whenever he or she has a valid cause of action:

> [A] litigant has standing whenever there is a legal cause of action.  Further, whenever a litigant meets the requirements of MCR 2.605, it is sufficient to establish standing to seek a declaratory judgment.  Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing.  A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.  [*Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 372; 792 NW2d 686 (2010) (footnotes omitted).]

MAEDA contends that the Committee cannot challenge Ordinance 2023-08 because it is a zoning ordinance and the Zoning Enabling Act, MCL 125.3101 *et seq.*, limits who can challenge a zoning ordinance.  Its argument misses the point and posture of the Committee's action.  As this Court has explained, the Zoning Enabling Act governs who may *appeal* a zoning decision to a zoning board or the circuit court.  See *Sakorafos*, ___ Mich App at ___; slip op at 5-6.  It does not govern standing to assert direct challenges to a zoning ordinance.  See *id*.  The common-law standard governs direct challenges like the challenge at issue here.  *Id*.

Here, the petitioners formed the Committee and had it petition for a referendum on Ordinance 2023-08.  The City's charter specifically provided standing to do just that.  See Marshall Charter, § 5.02.  Once Eubank certified the petition as insufficient, the Committee had standing to challenge the decision by Eubank and to challenge the City's decisions to approve Eubank's decision through a writ of mandamus, see MCR 3.305(A)(2), because it had a "substantial and distinct interest" in ensuring that its petition for a referendum was not improperly certified as insufficient, see *Lansing Sch Ed Ass'n*, 487 Mich at 374.  In short, the Committee had (and has) standing.

### B.  THE COMMITTEE WAS NOT ENTITLED TO MANDAMUS RELIEF

As stated, the Committee's mandamus request failed for at least two reasons: (1) the existence of an alternative remedy; and (2) lack of a legal right to put the referendum on the ballot.

The writ of mandamus is an extraordinary form of relief.  See *Taxpayers for Mich Constitutional Gov't v State of Michigan*, 508 Mich 48, 81; 972 NW2d 738 (2021).  Its purpose is to enforce duties the law created under circumstances in which the law has not created a specific remedy, and justice requires one.  See *id.*, citing *State Bd of Ed v Houghton Lake Comm Schs*, 430 Mich 658, 666; 425 NW2d 80 (1988).  As observed by our Supreme Court, mandamus has four elements:

> To obtain this extraordinary remedy, the plaintiff bears the burden of showing that (1) the plaintiff has a clear, legal right to performance of the specific duty sought, (2) the defendant has a clear legal duty to perform, (3) the act is ministerial, and (4) no other adequate legal or equitable remedy exists that might achieve the same result. [*Taxpayers for Mich Constitutional Gov't*, 508 Mich at 81-82 (quotation marks and citation omitted).]

"A clear legal right is a right clearly founded in, or granted by, law; a right which is inferable as a matter of law from uncontroverted facts regardless of the difficulty of the legal question to be decided." *Attorney Gen v Bd of State Canvassers*, 318 Mich App 242, 249; 896 NW2d 485 (2016). A clear legal duty is one that may be inferred as a matter of law from the uncontroverted facts. *Adams v Parole Bd*, 340 Mich App 251, 260; 985 NW2d 881 (2022). "A ministerial act is one in which the law prescribes and defines the duty to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Id*. (quotation marks and citation omitted).

The trial court correctly concluded the Committee was not entitled to a writ of mandamus because it did not have a clear, legal right to have a referendum on a Marshall ordinance containing appropriations, see Marshall Charter § 5.01(b) (prohibiting referenda or ordinances containing appropriations), and it had an adequate legal remedy, namely judicial review of the city council's decision, see Marshall Charter § 5.04(c) (explicitly providing that the city council's final determination as to the sufficiency of a petition is "subject to review by a court of competent jurisdiction"). Although these are narrow grounds, to determine whether the Committee had a legal right to have the referendum certified and included on the ballot, and to determine whether other adequate legal or equitable remedies existed, we must examine the scope of the power of referendum within the Marshall Charter.

As a home rule city, the City had to include certain provisions in its charter. See MCL 117.3. Other provisions were, however, merely permissible. The City could include—but was not required to include—provisions for "initiative and referendum on all matters within the scope of the powers of that city and the recall of city officials." MCL 117.4i(g). The people of Marshall chose to include provisions for a referendum in their charter. See Marshall Charter, § 5.01(b). The people, however, limited that power to reviewing ordinances other than certain enumerated types of ordinances: "such power shall not extend to the annual operating budget or capital programs, any emergency ordinance, or *any ordinance relating to the appropriation of money* or levy of taxes." Marshall Charter, § 5.01(b) (Emphasis added).

This limitation means that there is no right under the charter to a referendum on an ordinance relating to appropriations. In this case, the Committee and the petitioners petitioned to hold a referendum on Ordinance 2023-08, the zoning ordinance at issue. An ordinary zoning ordinance could be subject to referendum. See *Albright v Portage*, 188 Mich App 342, 347-349; 470 NW2d 657 (1991) (holding that zoning ordinances are legislative acts—not administrative acts—and are subject to referendum if the charter allows for referenda on ordinances). This ordinance, however, included appropriations for "$40,000 for site plan review services and $250,000 for building inspection services for the development of the proposed industrial project on the properties identified and described under this ordinance." So long as the ordinance

-10-

contained these appropriations, the Committee and the petitioners lacked a legal right to a referendum on the ordinance. See Marshall Charter, § 5.01(b). Without a clear, legal right to certification of the referendum and its placement on the ballot, see *id.*, the trial court had no authority to issue a writ of mandamus. See *Taxpayers for Mich Constitutional Gov't*, 508 Mich at 81-82. The trial court correctly reached this conclusion.

In doing so, the trial court relied on our Supreme Court's decision *in MGM Grand Detroit v Comm Coalition for Empowerment, Inc*, 465 Mich 303; 633 NW2d 357 (2001). The trial court relied on *MGM Grand* for the proposition that Eubank had the authority to determine whether Ordinance 2023-08 was subject to referendum and whether plaintiffs had a right to have the issue on the ballot. There, the Detroit city council passed an ordinance changing the zoning at a particular site to allow operation of a casino. See *id.* at 311-312 (CAVANAGH, J., dissenting) (reciting the facts). After the defendants in that case collected sufficient signatures to subject the zoning ordinance to a referendum, the city council repealed the ordinance and passed a new zoning ordinance that included an appropriation. See *id.* The defendants again collected sufficient signatures to subject the zoning change to referendum, but the city clerk refused to certify it because the ordinance was exempt from the power of referendum. See *id.* at 312. MGM sued for a declaration that the petition was invalid, and the defendants filed a third-party complaint asking the trial court to order the city clerk to certify the petition. See *id.* The trial court agreed that the ordinance was not subject to referendum, granted MGM's motion for summary disposition, and denied the relief requested by the defendants. See *id.* at 312-313.

On appeal to our Supreme Court, the majority observed that Detroit's charter specifically excluded ordinances that included appropriations from the power of referendum, noted that the ordinance at issue included an appropriation, and concluded that the ordinance was not subject to the power of referendum. *Id.* at 304-305. In short, there was no clear right to have the referendum placed on the ballot. See *id.* It therefore affirmed the trial court's decision to grant MGM's motion for summary disposition. *Id.* at 305. Even though the majority's analysis did not include an assessment of the clerk's authority, it nevertheless plainly held that the trial court correctly denied the defendants' request for a writ of mandamus to compel the city clerk to certify a petition to subject an ordinance to referendum when the ordinance was not in fact subject to the power of referendum. To the extent that the trial court in this case correctly determined that Ordinance 2023-08 was not subject to the power of referendum under the Marshall Charter, it did not err when it relied on the decision in *MGM Grand Detroit* to conclude that it could not order Eubank to certify a petition for referendum that was plainly contrary to the Marshall Charter without regard to whether Eubank should have certified the sufficiency of the petition in the first place.[8]

The trial court also correctly concluded that the mandamus claim failed because of the existence of another adequate legal remedy, namely, the ability to challenge the city council's final decision on certification in court. See Marshall Charter, § 5.04(b). A trial court may not issue a

---

[8] The Committee also argues that the decision in *MGM* can be distinguished from the facts of this case because, in its view, the Marshall Charter does not permit appropriations to be made by ordinance. We address this issue below.

-11-

writ of mandamus if the party requesting the writ has another adequate remedy. See *Taxpayers for Mich Constitutional Gov't*, 508 Mich at 81-82.

The Marshall Charter specified the manner for petitioning for a referendum on an ordinance in the charter. See Marshall Charter, § 5.02. It also specified the signature requirements, form, and manner for submitting the petition to the city clerk. See *id.*, § 5.03(a), (b), (d). Once submitted, the city clerk had a duty to review the petition within 20 days. The city clerk "shall complete a certification as to its sufficiency, specifying if it is insufficient, the particulars wherein it is defective and shall promptly send a copy of the certificate to the petitioner's committee by certified mail." Marshall Charter, § 5.04. The Marshall Charter provided that a committee whose petition has been certified as insufficient may request that the city council review the certification. See Marshall Charter, § 5.04(b). In such cases, the city council "shall review the certificate at its next meeting . . . and approve or disapprove it, and the council's determination shall then be a final determination as to the sufficiency of the petition." Marshall Charter, § 5.04(b). But the charter provided that the city council's final determination was subject to judicial review:

> A final determination as to the sufficiency of the petition shall be subject to review by a court of competent jurisdiction. A final determination of insufficiency, even if sustained upon court review, shall not prejudice the filing of a new petition for the same purpose. [Marshall Charter, § 5.04(c).]

In other words, the charter explicitly provides a legal remedy to challenge the council's final determination regarding petition sufficiency: an appeal.

In other circumstances, we have traditionally concluded that the availability of a legal or equitable remedy through the courts renders the fourth prong of a mandamus claim (i.e., no other adequate legal or equitable remedy exists) unsatisfied. See, e.g., *Hanlin v Saugatuck Twp*, 299 Mich App 233, 248-249; 829 NW2d 335 (2013) (affirming trial court's grant of summary disposition on mandamus claim "because an action in the nature of quo warranto was available to [the plaintiffs, so] they could not maintain a claim for mandamus . . . ."); *Mich Ass'n of RR Passengers v Southeastern Mich Transp Auth*, 140 Mich App 111, 114-115; 362 NW2d 904 (1985) (affirming trial court's dismissal of a complaint for a writ of mandamus, due to an adequate legal remedy, where the statute authorizing the defendant regional transit authority required the authority to give public notice and hold hearings before making a final decision to change its rail service and "[a]ny party aggrieved by [the authority's] decision can appeal to the circuit court."). See also *Hill v State*, 382 Mich 398; 170 NW2d 18 (1969). Here, the charter explicitly provided an appeal of the city council's decision to a court of competent jurisdiction. Such an appeal is an adequate legal (or equitable) remedy capable of reaching the same desired result. The Committee did not pursue such an appeal. The trial court correctly concluded that this was a basis for dismissing the mandamus claim.

-12-

Either of these bases provided grounds for dismissing the Committee's complaint for mandamus. And either provides a basis for affirming. We need not analyze the issue of the scope of Eubank's legal duties and whether they were ministerial.[9]

## IV. VALIDITY OF APPROPRIATIONS IN ORDINANCE 2023-08

The trial court did not err when it determined that the City could validly make an appropriation by ordinance. This is a core aspect of the Committee's claims. In substance, the Committee argues that the City appropriations within Ordinance 2023-08 were invalid because (1) the charter only allows appropriations by resolution, not by ordinance, and (2) Ordinance 2023-08's title did not identify appropriations as part of its purpose. If the appropriations were not part of the ordinance, then Ordinance 2023-08 would be vulnerable to ballot referenda. We conclude

---

[9] The Committee also argues that Eubank's decision not to certify the ballot referendum was an unconstitutional limitation on who can collect signatures for a petition to subject an ordinance to a ballot referendum. Specifically, the Committee contends she interpreted the City's charter to require the members who formed the committee to petition for a referendum to be the only persons who could collect signatures for the petition. The trial court refused to consider this purported error. We also decline to reach this issue because our decision on mandamus renders it, for the purposes of this appeal, moot. See *Gleason v Kincaid*, 323 Mich App 308, 314-315; 917 NW2d 685 (2018); see also *Mich Republican Party v Donahue*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 364048); slip op at 2.

This Court decides actual cases and controversies; it does not entertain abstract questions of law or decide cases that do not rest on existing facts or rights. *Gleason v Kincaid*, 323 Mich App 308, 314-315; 917 NW2d 685 (2018). This Court will instead dismiss as moot appeals that do not involve actual cases or for which it cannot grant relief. *Id*. For that reason, the party seeking relief must establish that there is an actual case or controversy at every stage of the litigation. See *Lewis v Continental Bank Corp*, 494 US 472, 477-478; 110 S Ct 1249; 108 L Ed 2d 400 (1990). A court cannot redress an injury with a favorable decision if the decision would not affect the rights of the litigants in the case before the court. *Id*. This Court may, however, review a moot issue if it is publicly significant, likely to recur, and yet likely to evade judicial review. See *Mich Republican Party*, ___ Mich App at ___; slip op at 2.

Because we conclude that the Committee was not entitled to have the referendum put on the ballot, a declaration regarding the constitutionality of limiting who can collect petition signatures for the ballot referendum based on their membership in the Committee, would have no conceivable effect on the rights of the litigants—the City would still be entitled to have the petition rejected as a matter of law. See *Lewis*, 494 US at 477-478. Nonetheless, to the extent that the City or its officers interpret Section 5.02 of the Marshall Charter to limit petition signature gathering to only members of a petitioners' committee, the City should strongly consider whether such a limitation on protected political speech is untethered from a valid government interest. See *Buckley v American Constitutional Law Foundation, Inc*, 525 US 182, 186-187, 194-196; 119 S Ct 636; 142 L Ed 2d 599 (1999) (holding that banning paid circulators or limiting the circulators to registered voters amounts to a diminution in speech that is not justified by the government's interest in policing lawbreakers among petition circulators).

-13-

that the trial court correctly interpreted the charter as allowing the City to pass appropriations by ordinance and that Ordinance 2023-08 did not violate the charter's title-ordinance rules.

This Court reviews de novo whether a party has standing to bring a claim. See *MCNA Ins Co*, 326 Mich App at 743. This Court also reviews de novo the proper interpretation and application of the City's ordinances, *Gmoser's Septic Serv, LLC*, 299 Mich App at 509, and charter, *Barrow*, 301 Mich App at 411. This Court reviews a trial court's decision whether to grant a preliminary injunction for an abuse of discretion. *Slis v Michigan*, 332 Mich App 312, 335; 956 NW2d 569 (2020). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.*

## A. STANDING

As explained, the Committee and the petitioners had the right under the City's charter to challenge the city council's decision to ordain an ordinance by petitioning for a referendum on the ordinance. See Marshall Charter, § 5.02. Once the Committee submitted its petition, it had standing to ensure that its petition was not wrongfully certified as insufficient. See *Lansing Sch Ed Ass'n*, 487 Mich at 374. To that end, it had standing to challenge whether the city council could lawfully include an appropriation in the ordinance that would exempt the ordinance from the power of referendum. Put differently, after filing its petition, the Committee had a concrete and distinct interest that gave it standing to contest the appropriation provisions to the extent that those provisions affected the decision whether to certify its petition as insufficient. See *id.* The Committee continues to have standing to challenge those provisions on appeal.

## B. APPROPRIATIONS BY ORDINANCE AND RESOLUTION

The Marshall Charter does not explicitly prohibit passing appropriations by ordinance, like those in Ordinance 2023-08, and it does not explicitly require or authorize them. It does, however, explicitly contemplate appropriations by ordinance. See Marshall Charter, § 5.01(b).

The City's charter provides that the City has "any and all powers, privileges and immunities which home rule cities are or may hereafter be required or permitted to exercise . . . ." Marshall Charter, § 1.03. The City's charter further provides that it must be liberally construed in favor of the City and states that "the specific mention of particular powers in the charter shall not be construed as limiting in any way the general power stated in this article." Marshall Charter, § 1.05.

The City's charter vests all the City's powers in the city council. See Marshall Charter, § 2.05. The city council had the power to adopt resolutions, ordinances, and technical codes as provided under Article IV of the charter. See Marshall Charter, § 2.16. The City's charter also required the city council to adopt an annual budget as provided under Article IX. See Marshall Charter, § 2.19.

Article IV of the City's charter states that all "legislation of the city shall be by ordinance or resolution." Marshall Charter, § 4.01(a). The charter limits the use of resolutions to "matters required or permitted by law, or this charter, and to matters pertaining to the internal concerns of the city." Marshall Charter, § 4.01(c). The charter further required the city council to act by ordinance when "establishing a rule or regulation which provides for a penalty" or when "amending or repealing an ordinance previously adopted, or when required by law or this charter."

-14-

Marshall Charter, § 4.01(d). Critically, unlike Section 4.01(c), Section 4.01(d) is not a limitation on the city council's authority. Although the charter required the city council to legislate by ordinance when one of the criteria under Section 4.01(d) applied, the charter did not preclude it from legislating by ordinance under circumstances when one of those criteria did not apply. Read together, the City's charter provided that legislation by ordinance was the default, whereas legislating by resolution would be permissible only when one of the criteria stated under Marshall Charter, § 4.01(c), applied. In short, nothing in Article IV prevented the city council from legislating an appropriation by ordinance. It is worth noting that legislating by ordinance is a significantly more cumbersome process than legislating by resolution. Compare Marshall Charter, § 4.01(b) (providing the process for legislating by resolution: a motion followed by a vote of the council members present) with § 4.02 (providing the process for legislating by ordinance, including written introduction, title requirements, notice by publication, public hearing, and vote).

On appeal, the Committee argues that Article IX of the charter bars appropriations by ordinance. It does not. Article IX of the charter provides the City's budgeting process. Article IX requires various city officials to "submit to the city manager an itemized estimate of their expenditures for the next fiscal year." Marshall Charter, § 9.02. It then requires the city manager to prepare an itemized budget with an estimate of the revenues for the coming fiscal year and the city manager's recommendations. See Marshall Charter, § 9.02. Section 9.05, the section on which the Committee primarily relies, provides, "Not later than the first meeting of the council in June, the council *shall, by resolution*, adopt all budgets for the next year and *shall, in such resolution, make an appropriation* of the money needed for municipal purposes during the ensuing fiscal year . . . ." Marshall Charter, § 9.05 (emphasis added). The charter further limits the city council's authority to spend money outside the budget process: "After the budget has been adopted, no money shall be drawn from the treasury of the city nor shall any obligation for the expenditure of money be incurred, except pursuant to the budget appropriation." Marshall Charter, § 9.06.

The prohibition against drawing money from the treasury or incurring obligations, "except pursuant to the budget appropriation," does not prohibit the City from spending money on matters not included in the budget. City governments routinely confront unanticipated circumstances that sometimes result in unanticipated expenses which require them spend money on contingencies that arise during the fiscal year. The limitation stated under Marshall Charter, § 9.06, most naturally means that the city council must limit its draws and pay its debts within the parameters set by the budget.

The Committee, however, disagrees and emphasizes the prohibition stated under Marshall Charter, § 9.06. It argues Section 9.06 requires the City to make all appropriations for entire fiscal year during the initial budgeting process. In other words, it maintains that the charter renders the budget adopted in June of each year inviolate and prohibits any further appropriations throughout the year. It then argues from that proposition that it necessarily follows that the city council lacked the authority to include an appropriation by ordinance and that the trial court erred when it refused to sever the appropriation from Ordinance 2023-08.

The Committee's interpretation would require us to view the budgeting process in a silo without considering the provisions that give the city council the ability to respond to changing conditions throughout the fiscal year. It also requires us to map that narrow view onto the entirety of the charter, ignoring conflicts it creates with other provisions within the charter. The charter,

for example, authorizes the city council to "transfer any unencumbered appropriation balance, or any portion thereof, from one department, fund, or agency to another," with some exceptions, during the fiscal year. See Marshall Charter, § 9.06. This power authorizes the city council to appropriate funds for an unanticipated expense during the fiscal year by moving unused and unencumbered funds between departments or agencies to cover the appropriation. See *id*. The charter also allows the city council to act during the year to reduce appropriations when income is less than was anticipated in the budget. See Marshall Charter, § 9.07.

Unlike the provisions for borrowing, which provide that the city council could exercise its borrowing power by resolution *or* ordinance, see Marshall Charter, § 9.08, the city council could not exercise its powers under Marshall Charter, §§ 9.06 and 9.07, by resolution. This is because the city council was empowered to act by resolution only when "required or permitted by law, or this charter," or when the matter pertained "to the internal concerns of the city," Marshall Charter, § 4.01(c), and Marshall Charter, §§ 9.06 and 9.07, do not include authority to act by resolution. Accordingly, the city council can act in a manner consistent with Marshall Charter, §§ 9.06 and 9.07, through an ordinance.

The Committee reads the deliberate inclusion of the term ordinance as a permissible means for borrowing under Marshall Charter, § 9.08, as proof that the authority to transfer funds under Marshall Charter, § 9.06, must be done by resolution. Marshall Charter, § 9.06, makes no mention of the method for performing the transfer, and Marshall Charter, §§ 4.01(c) and (d), establish that the city council cannot act by resolution except in certain specified cases and may act by ordinance even in the absence of a statement to that effect. The most logical interpretation for the decision to include the power to act by resolution or ordinance in Marshall Charter, § 9.08, was to establish that the city council had the power to act by resolution to borrow. The failure to include that provision would have precluded the city council from acting by resolution under Marshall Charter, § 4.01(c). Contrary to the Committee's position, it was not superfluous to state that the city council had the authority to act by resolution or ordinance under Marshall Charter, § 9.08. See *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002) ("[I]t is important to ensure that words in a statute not be ignored, treated as surplusage, or rendered nugatory."). Instead, this section tends to support the concept that the charter contemplated that ordinances, the default (and more cumbersome) mechanism for municipal legislation, would be a mechanism for appropriations. Cf. Marshall Charter § 9.08, § 5.01(b).

The failure to include that the city council could act by ordinance cannot be understood to imply that the city had no authority to act by ordinance. The city council had the authority to act by ordinance under Marshall Charter, § 4.01(d), without the need to mention that power because acting by ordinance is the city council's default manner of legislating. Even assuming that the city council could perform the appropriation changes stated under Marshall Charter §§ 9.06 and 9.07, by resolution, nothing prevented the city council from acting by ordinance. Compare Marshall Charter, § 4.01(c) and § 4.01(d). Moreover, the requirement to act by resolution stated in Marshall Charter, § 9.05, by its own terms, applied only to the adoption of the initial budget for the coming fiscal year; it did not prevent the city council from making any appropriation otherwise permitted under the charter in an ordinance during the fiscal year.

As the trial court correctly noted, the City's charter also specifically contemplates that the city council may make appropriations in an ordinance. See Marshall Charter, § 5.01(b). If that

were not the case, then there would be no need to exempt ordinances that contain appropriations from the power of referendum. See Marshall Charter, § 5.01(b). It is the Committee's preferred interpretation that renders a part of the charter nugatory. See *Robertson*, 465 Mich at 748.

Because the City's charter must be liberally construed in favor of the exercise of the City's powers, see Marshall Charter, § 1.05, and the charter does not contain any prohibition—direct or implied—that the city council cannot make an appropriation by ordinance, the city council's decision to include an appropriation in Ordinance 2023-08 was not necessarily unlawful under the charter. We therefore conclude that the trial court did not err when it concluded that the city council could lawfully appropriate funds by ordinance.

## C. TITLE-OBJECT AND SINGLE-SUBJECT RULES

The Committee also argues that the appropriation in Ordinance 2023-08 violated the charter's title-object rule. Though this presents a closer question, we conclude that the ordinance substantially complied with the charter.

The charter provides, in relevant part, that "no ordinance shall contain more than one subject, and the ordinance title must clearly express that subject." Marshall Charter, § 4.02(a). This limitation is substantially similar to the title-object clause in Michigan's constitution. See Const 1963, art 4, § 24 ("No law shall embrace more than one object, which shall be expressed in its title."). The purpose of such clauses is to "prevent the Legislature from passing laws not fully understood, to ensure that both the legislators and the public have proper notice of legislative content, and to prevent deceit and subterfuge." *Enbridge Energy, LP v Michigan*, 332 Mich App 540, 545-546; 957 NW2d 53 (2020) (quotation marks and citation omitted). A challenge under a title-object rule, such as that found in the City's charter, can take two forms: (1) a title-body challenge and (2) a multiple-object challenge. *Id*. The challenge at issue here takes both forms.

When reviewing a title-object challenge, this Court must make "all possible presumptions" in favor of constitutionality and must construe the title "reasonably, not narrowly and with unnecessary technicality." *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 464; 208 NW2d 469 (1973). As this Court has explained, a title-object limitation is not intended to restrict the Legislature's power, it is intended to ensure that the Legislature gives fair notice of the challenged provision:

> A title-body challenge is an assertion that the body of an act exceeds the scope of its title. However, the title of an act is not required to serve as an index to all of the provisions of the act. The goal of the clause is notice, not restriction of legislation. A title will only fail to give fair notice if the subject in the body is so diverse from the subject in the title that they have no necessary connection. Even if not directly mentioned in the title of the act, if the title comprehensively declares a general object or purpose, a provision in the body is not beyond the scope of the act as long as it is germane, auxiliary, or incidental to that general purpose. [*Enbridge Energy, LP*, 332 Mich App at 546 (quotation marks and citations omitted).]

A multiple-object challenge looks at the body of the law to determine whether the act embraces more than a single object. See *Ray Twp v B&B's Gun Club*, 226 Mich App 724, 731;

-17-

575 NW2d 63 (1997). An ordinance does not violate a title-object clause solely because it contains more than one means of attaining its primary purpose. *Id*. Rather, a violation exists only when "the law contains subjects so diverse that they have no necessary connection." *Id*.

The Committee argues that Ordinance 2023-08 suffered both a title-object defect and a multiple-object defect. The city council gave the following title to Ordinance 2023-08: "AN ORDINANCE TO AMEND THE ZONING MAP OF THE CITY OF MARSHALL SO AS TO CHANGE THE ZONING OF A PARCEL OF REAL PROPERTY, PARCEL #53-281-021-00, FROM TOWNSHIP ZONING TO INDUSTRIAL AND MANUFACTURING COMPLEX (I-3)." It is undisputed that the title did not mention appropriations. But, in the ordinance, the city council not only amended the zoning map to change the zoning for the identified parcel, it also appropriated "$40,000 for site plan review services and $250,000 for building inspection services for the development of the proposed industrial project on the properties identified and described under this ordinance." The Committee maintains that the title of Ordinance 2023-08 did not encompass these appropriations because a change in zoning bears no connection to an appropriation for services related to a development project. It likewise argues that Ordinance 2023-08 also had multiple objects in violation of Marshall Charter, § 4.02(a), because an ordinance change is one object, and a budget amendment is another object.

We conclude that the appropriations did not violate Section 4.02(a) of the Marshall Charter. The city council did not state in its title that it was amending the zoning map in general; it provided that it was amending its zoning map to change the zoning classification for a specific parcel, which it identified, and stated that it was changing the zoning to a special category, I-3. It was well publicized that the parcel identified in Ordinance 2023-08 was the parcel intended for the development of Ford's Blue Oval Battery Park. The City had also created the I-3 zoning classification specifically for that parcel and to further the development intended for that parcel. The title, for that reason, encompassed a significant zoning change involving a known and controversial development project.

A provision in an ordinance that is germane, auxiliary, or incidental to the generally stated purpose of the ordinance is not beyond the scope of the title. *Enbridge Energy LP*, 332 Mich App at 546. Even a routine zoning change may encompass costs that would ordinarily be borne by the agency charged with effecting the change. As such, the fact that Ordinance 2023-08 included appropriations did not necessarily violate the object-title rule stated under Marshall Charter, § 4.02(a), simply because the city council chose to address the fiscal need accompanying the zoning change in the zoning ordinance rather than in a separate ordinance.[10] Additionally, because of the nature of the zoning change at issue and the specified parcel to which it applied, an appropriation to pay for costs associated with the later development contemplated by the zoning

---

[10] Citing MCL 141.437(1), the Committee claims that all appropriations are always required to be in the form of an amendment to the general appropriations. That statute requires a legislative body to amend the general appropriations as soon as it becomes apparent that a deviation from the original general appropriations act is necessary. There is no indication in the record that the appropriation at issue caused a deviation in the general appropriations.

change would be within the range of expenses that the City would incur after making the zoning change. An ordinance "may contain any provision which directly relates to, carries out, and implements the principal object of the [ordinance]." See *Livonia v Dep't of Soc Servs*, 423 Mich 466, 499; 378 NW2d 402 (1985). As the trial court observed in its earlier opinion and adopted in its later opinion, the appropriation for the site plan review and for building inspections had a necessary connection to the development that the City intended to support by implementing the zoning change. Consequently, the appropriations did not violate the title-object clause and did not constitute a second, distinct purpose not encompassed by the object identified in the title. See *id*.; *Ray Twp* , 226 Mich App at 731.[11]

We conclude that the trial court did not err when it determined that Ordinance 2023-08 did not violate Marshall Charter, § 402(a). We therefore affirm the trial court's decision to dismiss the Committee's claims for injunctive and declaratory relief under MCR 2.116(C)(8). See *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221 & n 6; 761 NW2d 293 (2008) (noting that a claim for declaratory relief is actually a request for equitable relief that typically is cumulative to a request for a writ of mandamus or injunctive relief). The trial court did not err when it dismissed Counts I through III of the Committee's amended complaint.

## V. COMPLIANCE WITH THE CHARTER'S NOTICE REQUIREMENTS

The Committee argues that the trial court erred by dismissing Count V, a request for declaratory relief that Ordinance 2023-08 was invalid for failing to comply with the charter's notice requirements. We conclude that the Committee has failed to establish that the trial court erred when it dismissed this claim.[12]

---

[11] The Committee maintains that the trial court applied the wrong standard, but the trial court specifically acknowledged that the requirement would not be met "in the absence of a necessary connection between a section of the ordinance and its subject."

[12] Again, the Committee had standing to raise this claim. As explained, the standing test stated under the Zoning Enabling Act, on which MAEDA's standing arguments rely, does not apply to a direct claim. See *Sakorafos*, ___ Mich App at ___; slip op at 5-6. Direct challenges are governed by the common-law standard. *Id*. Under the common-law standard, the Committee has standing if it can establish that it has met the requirements of MCR 2.605 for declaratory relief or because it established that it had a special injury or right, or substantial interest that will be detrimentally affected in a manner different from the citizenry at large. See *Mich Republican Party*, ___ Mich App at ___; slip op at 5.

MAEDA argues that the Committee cannot seek a declaration that Ordinance 2023-08 was passed in violation of the City's charter because it did not even exist when the city council passed Ordinance 2023-08 and, for that reason, could not have suffered an injury. It is well settled that an organization, such as the Committee, has the same standing that its members have to assert claims. See *Mich Citizens for Water Conservation v Nestle Waters North American, Inc*, 479 Mich 280, 296; 737 NW2d 447 (2007), overruled not in relevant part by *Lansing Schs Ed Ass'n*, 487 Mich 349 (2010). MAEDA also argues that the Committee failed to state a claim for relief because

-19-

The City's charter provides that the City must give notice of a proposed ordinance before holding a hearing to consider whether to pass the ordinance. The City's charter states: "Following introduction of any ordinance, the city clerk shall publish a summary of the proposed ordinance in a local newspaper of general circulation in the city, together with a notice setting out the time and place for a public hearing on the proposed ordinance." Marshall Charter, § 4.02(b). The charter further provides that the city council may not hold the public hearing on the proposed ordinance "sooner than five (5) days after the publication." Marshall Charter, § 4.02(b). Giving these words their ordinary meaning, the City must publish at least one summary of the ordinance with a notice of the date of the public hearing to consider the ordinance, and the hearing must not be sooner than five days after the publication.

The Committee's argument that the City did not properly notice the ordinance because it started publishing its summary and notice on April 15, 2023—two days before the City introduced the ordinance—fails because of the nature of the publication containing the notice. The newspaper at issue, the Ad-visor and Chronicle, was a weekly publication. We, therefore, treat the publication as having been published continuously every day through to the new issue date—April 22, 2023. The City's notice, therefore, was effectively published anew every day, which included the day after Ordinance 2023-08 was introduced. See, e.g., *Leffler v Armstrong*, 4 Iowa 482 (1857) (stating that a notice is published continuously from the first day the paper includes the notice until the first issue without the notice); see also *Hinchman v Barns*, 21 Mich 556, 558 (1870) (stating that publication means taking some act to put the paper before the public). Nothing in Marshall Charter, § 4.02(b), prevented the City from making a continuous publication in order to ensure the greatest possible notice to the public. See *Petition of Boyd*, 332 Mich 553, 559; 52 NW2d 216 (1952) (rejecting a notice challenge premised on publication of the required one notice a week for two weeks on the ground that the notice appeared in two different newspapers because the statute did not require that each notice be published in the same paper). The Committee's argument invites this Court to read a penalty into the charter for beginning a continuous publication before the introduction of an ordinance. We decline such invitation. See *Protecting Mich Taxpayers v*

---

a claim for declaratory judgment is a form of relief that must be premised on an underlying cause of action and the Committee did not have an underlying cause of action. More specifically, the Committee pleaded its claims under Count IV and V as alternatives to its claim for a writ of mandamus.

Although this Court has held that a request for declaratory relief is a remedy, not a claim, see *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 221; 761 NW2d 293 (2008), our Supreme Court has recognized that a party who has met the requirements stated under MCR 2.605(A)(1) has a cause of action. See *Lansing Schs Ed Ass'n*, 487 Mich at 377 n 26 ("Thus, the teacher-plaintiffs seeking enforcement of MCL 380.1311a(1) must meet the requirements for some other cause of action, such as a writ of mandamus under MCR 3.305 or a declaratory action under MCR 2.605(A)(1)."); see also *League of Women Voters of Mich*, 506 Mich at 585-586 (stating that the plaintiffs requested a declaratory judgment, which was a proper claim under MCR 2.605, but plaintiffs failed to establish that there was an actual controversy under that court rule). Accordingly, if the Committee established the elements for a declaratory action under MCR 2.605(A)(1), then it would be entitled to declaratory relief.

*Bd of State Canvassers*, 324 Mich App 240, 250; 919 NW2d 677 (2018) (holding that this Court cannot read a penalty into a law when none exists).

Our Supreme Court has held that, as long as the municipality actually published notice and made postings, which served the purpose of providing notice to the general public, the fact that the notice was not for the full time required would not invalidate the election on the resolution. See *Bay Co v Hand*, 257 Mich 262, 268; 241 NW 256 (1932). Our Supreme Court has also held that it will not invalidate a law when the municipality has substantially complied with the steps required before holding a vote. *Mich Pub Serv Co v Cheboygan*, 324 Mich 309, 340; 37 NW2d 116 (1949). Although the City began publishing its notice on Ordinance 2023-08 before it introduced that ordinance, the City effectively provided notice for more than the required time before the hearing held to adopt it. Even if this were to amount to a technical violation as Committee alleges, it did not deprive the public of notice and does not warrant invalidating Ordinance 2023-08. See *Mich Pub Serv Co*, 324 Mich at 340; *Bay Co*, 257 Mich at 268.

The Committee complains that the summary published in the paper did not mention any appropriations. Echoing its title-object argument, it maintains that the failure to mention the appropriations in the summary rendered the notice improper. We disagree.

The Committee is correct that the City's notice only referred to an ordinance to change the zoning and provided information about the land to be affected along with a map of the area. The notice did not mention any proposed appropriations. But the City's charter does not specify what a summary must include to constitute adequate notice. It merely provides that the City had to publish a summary of the proposed ordinance. See Marshall Charter, § 4.02(b). A general summary is sufficient when the law governing notice does not require more. See *North Burns Park Ass'n v Ann Arbor*, 155 Mich App 686, 691; 400 NW2d 622 (1986). Here, the summary clarified that the *primary* purpose of the ordinance was to change the zoning for a specific parcel of property; that summary was adequate for purposes of noticing the public hearing. See *id*. Acknowledging that the appropriations within the ordinance are central to this appeal, they are far from the primary purpose of the ordinance. The critical issue was the rezoning, and the summary adequately notified the public of that issue.

The early publication did not violate the City's charter. The summary provided adequate notice of the ordinance at issue. The trial court correctly dismissed this claim under MCR 2.116(C)(8).

VI. DID ORDINANCE 2023-08 VIOLATE AGREEMENTS WITH TOWNSHIP

The Committee has not established that the trial court erred when it dismissed its claim that Ordinance 2023-08 violated the Master 425 Agreement. This relates to Count IV of the Committee's complaint. We conclude that although the trial court incorrectly concluded that the Committee lacked standing, it nonetheless reached the right conclusion by dismissing its claim.

Again, we begin with standing. Here, the trial court incorrectly concluded that the Committee lacked standing to seek a declaratory judgment related to the Master 425 Agreement. To the extent that the Committee was attempting to sue under the Master 425 Agreement—an agreement to which it was not a party—to compel the City to change its zoning, it would lack

standing to enforce the agreement.  See *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 212-213; 737 NW2d 670 (2007).  See also *Brunsell v Zeeland*, 467 Mich 293, 296; 651 NW2d 388 (2002) (stating that incidental beneficiaries to a contract cannot sue to enforce it under the third-party beneficiary statute).  But that is not what the Committee was doing.  Rather, it sued for a declaration that Ordinance 2023-08 was void because the City did not have the authority to pass Ordinance 2023-08 given that the City bargained away its authority to change the zoning for parcels governed by the Master 425 Agreement.  The Committee would have standing to assert that claim for the same reasons that it had standing to sue for a declaration that Ordinance 2023-08 was void for failure to follow the charter's notice provisions.  See *Washington Gas Energy Servs, Inc v Dist of Columbia Pub Serv Comm*, 893 A2d 981, 988-989 (DC, 2006); *Town of Lima v Robert Slocum Enterprises, Inc*, 38 App Div 2d 503, 506; 331 NYS2d 51 (1972).  Accordingly, the trial court erred when it dismissed this claim for lack of standing.  We nonetheless conclude that the trial court reached the correct outcome.

The Committee's claim fails on the merits for two reasons.  First, under the Master 425 Agreement did not contract away its ability to zone property.  Second, even if it did, Ordinance 2023-08 did not constitute a breach of the agreement.

The Legislature authorized municipalities to include provisions on the adoption of ordinances in agreements such as the Master 425 Agreement.  See MCL 124.26(c).  But this authority stops short of the municipality abandoning its core functions.  A legislature can never bargain away a core legislative or governmental function.  See *United States v Winstar Corp*, 518 US 839, 888-889; 116 S Ct 2432; 135 L Ed 2d 964 (1996) (opinion by SOUTER, J.) (state is precluded from bargaining away its police power).  The power to enact zoning ordinances is a core function of the City's police power.  See *Landowners v South Regional Airport Agency*, 977 NW2d 486 (Iowa, 2022) (holding that zoning is a core governmental function that cannot be bargained away).  The 425 Agreement did not amount to the City contracting away its ability to pass ordinances.

Even assuming that the City had the authority to contract away its right to zone the property at issue in the Master 425 Agreement, the existence of such an agreement does not render any zoning ordinance involving property governed by that agreement void as a matter of law because a city's authority to pass ordinances does not depend on contractual agreements.  See *Grand Haven v Grocer's Co-op Dairy Co*, 330 Mich 694, 696-698; 48 NW2d 362 (1951) (recognizing that a home rule city's authority to enact laws is subject only to state law and the city's charter).  Whether the passage of an ordinance amounted to a breach of the Master 425 Agreement and what relief would be appropriate would be a matter for the parties to resolve in a contract action.  Yet, as previously concluded, the Committee had standing to sue for a declaration that Ordinance 2023-08 was void on other grounds.  Because Ordinance 2023-08 was properly passed without regard to whether the City breached the Master 425 Agreement by passing it, the Committee's claim that Ordinance 2023-08 was void failed as a matter of law.

In the Master 425 Agreement, the City and the Township agreed to create the JPC and stated that the JPC "shall control all land usages for lands subject" to the Master 425 Agreement.  They further agreed that the JPC would conduct itself as provided in Schedule A.  The parties agreed that the JPC would administer all commercial and industrial lands regardless of location using the City's zoning and planning act, rather than the Township's zoning act, and would follow

the City's procedures. The City and Township further agreed, in relevant part, that definitions for commercial and industrial lands, would be governed by the definitions given those lands in the City's then current zoning ordinance. They provided in ¶ 3 that the definition would remain the same for any land governed by the agreement, as least for purposes of the Master 425 Agreement, notwithstanding the passage of an ordinance changing the definitions, unless both parties agreed to the change.

The Committee focuses on the fact that the City and Township granted the JPC "control" over usage. It suggests that the grant of control over usage gave the JPC final authority over zoning classification. But we do not read the use of the word "control" so expansively as to deprive the City of its right to change its own zoning ordinances. See *LeRoux v Secretary of State*, 465 Mich 594, 615-616; 640 NW2d 849 (2002) (restating the fundamental principle that one legislature cannot bind a future legislature or limit its power to amend or repeal statutes). And the terms of the Master 425 Agreement do not support that interpretation.

The City and Township agreed to give the JPC control, but also agreed that the JPC had to apply the City's zoning act and procedures for commercial and industrial lands. Nothing within those procedures, or for that matter, the Master 425 Agreement, prevented the City from amending its zoning map to change a classification. The JPC had to accept any changes to the applicable zoning stated in the City's act as a matter of course, unless the change affected a definition. Enforcing the newly modified zoning ordinance did not diminish the JPC's control over usage— it still had the authority to control usage consistent with the amended zoning ordinances. Given the language of the Master 425 Agreement, the City had every right to change zoning classification for a particular area and the JPC had to accept that change. Additionally, as the City correctly notes, the City's zoning ordinances reserved the right to amend the zoning act on its own motion and the JPC would, in that event, have a purely advisory role. See Marshall Zoning Ordinance, § 7.1. Consequently, even if the Committee had standing to assert a breach of the Master 425 Agreement, its claim would fail as a matter of law.

The trial court did not err when it dismissed the Committee's claim under MCR 2.116(C)(8). See *Bailey v Antrim Co*, 341 Mich App 411, 420; 990 NW2d 372 (2022) (stating that this Court will affirm if the trial court reached the right result, even if for the wrong reason). The trial court did not err when it dismissed Count IV of the Committee's complaint.

## VII. JURISDICTION OVER THE CROSS-APPEAL

We lack jurisdiction to rule on MEDC and MSF's cross-appeal even if we were to limit the scope of the cross-appeal to the issue of the trial court's decision on intervention. This Court reviews de novo whether it has jurisdiction to consider an appeal. *Chen v Wayne State Univ*, 284 Mich App 172, 191; 771 NW2d 820 (2009). Whether this Court has jurisdiction is always within the scope of this Court's review. *Id*.

The Michigan Constitution authorizes the Legislature to establish by law this Court's jurisdiction. See *id*. at 191-192. The Legislature has granted our Supreme Court broad authority to promulgate rules that establish whether and when this Court has jurisdiction to consider an appeal as of right or by leave granted. *Id*. at 192. Accordingly, the court rules generally govern this Court's jurisdiction. *Id*.

This Court has jurisdiction of an appeal of right filed by an "aggrieved party." MCR 7.203(A). Here, the Committee was a party, and it was aggrieved by the trial court's decision to dismiss its claims. See *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 290-291; 715 NW2d 846 (2006). Because the order dismissing the Committee's claim was a final order under MCR 7.202(6)(a), this Court had jurisdiction to hear the Committee's appeal as an appeal of right under MCR 7.203(A). The court rules further provide that, "[w]hen an appeal of right is filed or the court grants leave to appeal, any appellee may file a cross appeal." MCR 7.207(1). An appellee is a "party against whom an appeal is taken and who has an interest adverse to setting aside the judgment" and "any nonappellant party to a suit, whether involved in the appeal or not." 4 CJS, Appeal and Error, § 334; see also *Black's Law Dictionary* (9th ed) (defining "appellee" to be a "party against whom an appeal is taken and whose role is to respond to that appeal, usu[ally] seeking affirmance of the lower court's decision").

The genesis of the cross-appeal, however, was the trial court's order denying intervention, dated August 27, 2023. Because the trial court denied their motion to intervene, they were never parties to the substance of the suit. Only aggrieved *parties* have an appeal of right under MCR 7.203(A). See also *League of Women Voters of Mich*, 506 Mich 561, 579; 957 NW2d 731 (2020) (noting that only a party has standing to appeal, but granting the Legislature's request for leave to intervene and thereby giving it appellate standing). Further, only a *party* can be an appellee with a right to cross-appeal a decision under MCR 7.207(A)(1). See also *Costa v Comm Emergency Med Servs, Inc*, 263 Mich App 572, 583-584; 689 NW2d 712 (2004) (stating that MCR 7.207 allows any appellee to cross-appeal whenever an appellant has either filed an appeal of right or has been granted leave to appeal), aff'd 475 Mich 403 (2006). Accordingly, we do not have jurisdiction over an appeal of right or a cross-appeal of right by MEDC or MSF because neither were parties to the lower court case.

If they wished to challenge the trial court's decision, then they had to apply for leave to appeal that decision under MCR 7.203(B)(1) (giving this Court authority to grant leave to appeal from a judgment or order of the circuit court that is not a final judgment appealable of right). Additionally, they had to file the application within 21 days of the entry of the order about which they now complain. See MCR 7.205(A)(1)(a). The time limit applicable to an application for leave to appeal is jurisdictional. See MCR 7.205(A); *Chen*, 284 Mich App at 192. The trial court entered its order denying the motion to intervene by the Development Corporation and the Strategic Fund on August 7, 2023. But MEDC and MSF did not apply for leave to appeal at any point and only filed their claim of cross-appeal on February 26, 2024.

We are also barred from treating the claim of cross-appeal as a delayed application for leave to appeal, because MEDC and MSF filed it more than six months after the trial court entered the order denying leave to intervene. See MCR 7.205(A)(4)(a); see also MCR 1.108(3) (stating that, if a period of time is measured by months, then the last day of the period is the same day of the month as the day on which the period began). We, therefore, lack the discretion to allow the MEDC and MSF to appeal by delayed leave. See *Chen*, 284 Mich App at 199 & n 8 (recognizing

that this Court cannot even grant a delayed application for leave when the time limit has passed). For these reasons we dismiss the MEDC and MSF's cross-appeal for lack of jurisdiction.[13]

    We affirm.

/s/ Thomas C. Cameron
/s/ Noah P. Hood
/s/ Adrienne N. Young

---

[13] We decline the Committee's request to find that MEDC and MSF's appeal is a vexatious appeal and impose sanctions. Although this Court has the inherent authority to sanction a vexatious appeal on its own motion, a party may not request such a sanction unless it complies with the requirements stated under MCR 7.211(C)(8). See MCR 7.216(C)(1). MCR 7.211(C)(8) provides that a party requesting such sanctions must move for the sanctions. It further provides that a request contained in a brief on appeal does not constitute a motion. MCR 7.211(C)(8) ("A request that is contained in any other pleading, including a brief filed under MCR 7.212, will not constitute a motion under this rule."). We decline to consider the request for sanctions as it was improperly raised. See *Bonkowski v Allstate Ins Co*, 281 Mich App 154, 181-182; 761 NW2d 784 (2008).